UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA K. BRINEGAR,        :
                         :CIVIL ACTION NO. 3:16-CV-1872
        Plaintiff,    :
                         :(JUDGE CONABOY)
        v.             :
                         :
NANCY A. BERRYHILL,[1]   :
Acting Commissioner of  :
Social Security,     :
                         :
        Defendant.    :
                         :

---

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). (Doc. 1.) Plaintiff filed an application for benefits on May 8, 2013, alleging a disability onset date of April 10, 2001. (R. 14.) However, because of *res judicata* considerations related to her previous application for SSI, the relevant period for the current application begins on the filing date of May 8, 2013. (*Id.*) After Plaintiff appealed the initial denial of the claim, a hearing was

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure which addresses the substitution of parties when a public officer is replaced, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. Fed. R. Civ. P. 25(d). No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states that "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."

held on September 10, 2014, and Administrative Law Judge ("ALJ") Therese A. Hardiman issued her Decision on January 23, 2015, concluding that Plaintiff had not been under a disability during the relevant time period. (R. 26.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on July 12, 2016. (R. 1-5.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on September 12, 2016. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ's finding that Plaintiff has no severe physical impairments is not supported by substantial evidence and is harmful error; 2) the ALJ's RFC assessment imposing no exertional limitaions is not supported by substantial evidence; and 3) the ALJ committed a reversible error of law by failing to accord greater weight to the opinion of Joseph Primavera, Ph.D. (Doc. 11 at 3.) After careful review of the record and the parties' filings, the Court concludes this appeal is properly denied.

## I. Background

Plaintiff was born on December 26, 1965, and was forty-seven years old on the date the application was filed. (R. 25.) She has a high school education and does not have past relevant work. (*Id.*) Plaintiff reported that she was last employed as a dogsitter in 2008 and she had worked in sales in the "distant past." (R. 416.)

## A. Medical Evidence

## 1. Physical Impairments

On February 3, 2013, Plaintiff presented as a new patient to Marshall-Rismiller and Associates where she was seen by Robert A. Scalia, D.O. (R. 316-17.) By history, Plaintiff reported episodes of chronic joint pain, especially of the lower back with stiffness and decreased range of motion of the lower back and multiple joints of her body. (R. 316.) She said the symptoms had been present for years, she took Percocet for pain, and she had been diagnosed with rheumatoid arthritis in the past but had been unable to see a rheumatologist because she did not have insurance. (R. 316.) Plaintiff also reported a history of mood disorder, panic disorder, and ADHD treated with Xanax, Prozac, Geodon, and Adderall and followed by psychiatry. (*Id.*) Physical examination showed the following: height of five feet, five inches and weight of 212 pounds with a body mass index (BMI) of 35.3; healthy and well developed appearance with no signs of acute distress; alert and oriented x3; no edema of the lower limbs bilaterally; normal gait; low back pain and stiffness with decreased range of motion of lower back; and some joint pain of various joints. (R. 316-17.) Dr. Scalia assessed rheumatoid arthritis for which he recommended that Plaintiff continue to take Percocet for pain. (R. 317.) He also recommended that she continue with her medications for the mood disorder, panic disorder, and ADHD, and that she continue to follow

up with psychiatry. (R. 317.) At March and April office visits, Dr. Scalia's examination findings remained the same, and he referred Plaintiff to a rheumatologist. (R. 318-19, 320-21.)

Plaintiff saw rheumatologist Thomas M. Harrington, M.D., on April 5, 2013. (R. 272-75.) The reason for the visit was "generalized body aches and pains" of longstanding duration (over ten years). (R. 272.) Plaintiff reported that she had been diagnosed with fibromyalgia several years earlier and she had not seen a rheumatologist for several years due to lack of insurance but recently had gotten insurance again. (*Id.*) Plaintiff said her symptoms had been relatively stable on Percocet which she took on a regular basis (three to four per day). (*Id.*) She also ssid she had tender points to touch, morning stiffness for an hour and a half, and Raynaud's phenomena which caused her fingertips to turn white and painful on exposure to cold. (*Id.*) Plaintiff also reported her mental health history and said that she was due to see a psychiatrist in the near future. (*Id.*) Dr. Harrington recorded that Plaintiff's history included hypertriglyceridemia, one atrophic kidney since birth, recurrent kidney stones, and a motor vehicle accident in 2012 when her left half was overrun by the vehicle resulting in a vertebral fracture, and left shoulder and hip injuries. (*Id.*) Dr. Harrington made the following musculoskeletal examination findings: no synovitis, tenderness, or effusion; full range of motion of all joints; 5/5 grip strength;

4

three small non-tender firm subcutaneous nodules on the right forearm; no contractures; and more than twelve musculoskeletal tender points. (R. 274.) Dr. Harrington's Assessment stated "47 yo female with longstanding Hx of generalized muscle aches and pain lower back and knees; managed as fibromyalgia by rheumatologist at Baltimore (lost follow up) now comes for re-evaluation. Clinical posture consistent with FM, no current evidence of any inflammatory etiology." (*Id.*) Fibromyalgia was the primary encounter diagnosis for which Dr. Harrington recommended Plaintiff continue with Percocet which provided "reasonable control" of her pain, he added Mobic as needed for pain, and he provided a physical therapy referral. (R. 275.) He also diagnosed osteoarthritis which would be treated the same as fibromyalgia and would be evaluated with x-ray. (*Id.*) Dr. Harrington planned to see Plaintiff again in six months. (*Id.*)

On May 2, 2013, Plaintiff saw Dr. Scalia who noted that Plaintiff presented as "healthy and well-developed [with] [n]o signs of acute distress present [and] [a]lert and oriented x 3." (R. 323.) He recorded musculoskeletal physical examination findings of low back pain and stiffness, decreased range of motion of low back, some joint pain of various joints, and a normal gait for her age. (*Id.*) Dr. Scalia's diagnoses included rheumatoid arthritis for which he noted she was following up with rheumatology. (R. 323.)

On May 17, 2013, Plaintiff had bilateral knee x-rays because of pain. (R. 304.) Findings included "symmetrical mild to moderate narrowing of the medial compartments . . . [and] [m]inimal patellar osteophytosis, bilaterally." (*Id.*) The Impression was "[m]ild symmetric medial compartmental joint space narrowing in both knees. No evidence of acute osseous abnormality." (*Id.*)

At Plaintiff's six visits with Dr. Scalia from May 30, 2013, to October 14, 2013, he recorded musculoskeletal physical examination findings of low back pain and stiffness, decreased range of motion of low back, and some joint pain of various joints. (R. 382, 385, 388, 390, 392, 394.) He also noted that Plaintiff walked with a normal gait for her age. (*Id.*) He found that she consistently presented as "healthy and well-developed [with] [n]o signs of acute distress present [and] [a]lert and oriented x 3." (*Id.*) Dr. Scalia's diagnoses included rheumatoid arthritis at the first five visits (R. 385, 388, 390, 392, 394) but not in October (R. 382).

Plaintiff had her follow up visit with Dr. Harrington on October 18, 2013. (R. 340-46.) By Plaintiff's subjective history, he recorded that "Fibromyalgia - remains stable on Percocet as per Dr. Scalia tolerates the medicine without difficulty." (R. 340.) Dr. Harrington noted that osteoarthritis occasionally gave Plaintiff problems but the pain was helped by Percocet. (*Id.*) On physical examination, Plaintiff generally presented as "alert,

healthy, well nourished, well developed and anxious." (R. 341.)
Dr. Harrington made the following musculoskeletal examination
findings: no synovitis or effusion; decreased range of motion of
her right shoulder; 5/5 grip strength; right rotator cuff
tendinitis; and ten musculoskeletal tender points. (R. 341.) His
primary diagnosis was myalgia and myositis, unspecified, and he
also assessed Plaintiff to have "[o]steoarthritis, unspecified
whether generalized or localized, lower leg." (*Id.*) Dr.
Harrington also diagnosed rotator cuff syndrome and offered
Plaintiff an injection but she refused because she was afraid of
needles. (R. 340-41, 345.) She was to return in six months. (R.
346.)

From November 8, 2013, to June 2, 2014, Plaintiff saw Dr.
Scalia seven times and he again regularly recorded musculoskeletal
physical examination findings of low back pain and stiffness,
decreased range of motion of the low back, and some joint pain of
various joints. (R. 361, 364, 367, 370, 373, 376, 379.) He also
noted that Plaintiff walked with a normal gait for her age. (*Id.*)
Dr. Scalia found that Plaintiff consistently presented as "healthy
and well-developed [with] [n]o signs of acute distress present
[and] [a]lert and oriented x 3." (*Id.*) His diagnoses did not
include rheumatoid arthritis or fibromyalgia at any of these
visits. (*Id.*) However, at Plaintiff's May 2, 2014, office visit,
his assessments included "Joint Disorder Unspec Site Unspec" (R.

364), a finding not recorded the following month (R. 362).

**2. Mental Impairments**

Plaintiff had a Psychiatric Evaluation at Berks Psychiatry on February 5, 2013. (R. 236-37.) Plaintiff reported that she was unemployed and going to McCann School for paralegal services. (R. 236.) Her chief complaint was that she needed help, she was "not doing well." (*Id.*) By history, Plaintiff reported that she had been struggling with mental health issues for years and her symptoms of anxiety and depression were getting worse. (*Id.*) Plaintiff described a variety of symptoms including trouble sleeping, panic attacks, and mood swings. (R. 236.) Mental Status Examination by Rahman Khan, M.D., showed that Plaintiff was alert and oriented to time, place, and person; she had good eye contact; she looked nervous throughout the interview; her speech was normal in volume, rate, and tone; she had clear psycho-motor retardation; no formal thought disorder or delusional thinking were detected; her cognition and memory were fair; and her judgment and insight were good. (R. 237.) Dr. Khan assessed Bipolar Disorder II, Adult ADHD, and a GAF of 57. (*Id.*) He recommended individual therapy and medication management. (*Id.*)

May 18, 2013, Therapy Progress Notes from Gina Talarico of Berks Psychiatry indicate Plaintiff reported she was having some mood swings but they were not as bad as they had been and she was "doing ok other than that." (R. 286.) She specifically said she

was not having any problems with sleep or appetite. (*Id.*) Assessment showed that Plaintiff was oriented to time, place, and person, her mood was good, and her interactions were good. (*Id.*)

A January 15, 2014, Interpretive Summary from Service Access & Management, Inc., ("SAM") states that Plaintiff was referred for case management services "to provide support and to aid her with linking to community resources and maintaining mental health counseling services." (R. 412.) Noting a history of depression/anxiety issues and poor coping strategies, the Summary included the notation that Plaintiff needed to remain engaged in mental health counseling services to aid her with developing healthy feelings management skills. (*Id.*)

A January 27, 2014, Psychiatric Evaluation from SAM contains a good deal of background information that is largely illegible. (R. 347-48.) Check-the-box Mental Status Exam showed the following: normal and disheveled appearance; fair hygiene; calm psychomotor; appropriate affect; euthymic mood; normal speech; fully oriented x3; coherent thought process; denied hallucinations or delusions; normal attention/concentration; intact memory; and normal appetite, energy, sleep patterns, and libido. (R. 353.) The diagnosis was "R/O Bipolar Disorder[,] extensive history of substance abuse[,] mood disorder, NOS[,] [and] PTSD" with an assessed GAF of 60. (*Id.*) "Recommendations" consist of the provider's notation that despite great sympathy for Plaintiff and her the past traumas, he

cannot take her as a patient--because of her extensive history of drugs and DUI, the provider could not support the use of Xanax, Adderal, Topamax and Prozac. (*Id.*)

Background information in an Adult Psychiatric Evaluation conducted by New Beginnings on February 28, 2014, is largely illegible. (R. 407-09.) Check-the-box Mental Status Exam shows the following: appearance and behavior within normal limits; normal speech; euthymic mood; mood-congruent affect; goal directed thought process; alert sensorium; grossly intact cognition; and fair insight and judgment. (R. 410.) Plaintiff was diagnosed with mood disorder, NOS, rule out prescription medication addiction, PTSD as per Plaintiff's report, and bipolar disorder as per her report. (*Id.*) A GAF of 50-55 was assessed. (*Id.*) Cognitive Behavioral and Supportive Psychotherapy were recommended, and Plaintiff was to return to the clinic in four weeks. (R. 411.) Medication management visits in March, May, and July 2014 indicated that Plaintiff's Mental Status Exam was the same except for presentation with an anxious mood in May. (R. 404-06.) She consistently denied hallucinations, delusions, and obsessions. (R. 404-06, 410.)

During a Psychiatric Evaluation conducted by Joseph Primavera, Ph.D., on October 30, 2014, Plaintiff reported that she saw Dr. Kahn every one to two months and she saw Bernadine, a psychotherapist, twice a month. (R. 416.) Regarding her "current functioning," Plaintiff reported that she had disturbed sleep with

frequent nightmares, increased appetite and mood swings, panic attacks two to three times a week, agoraphobia, manic symptoms every couple months that last several days, auditory and visual hallucinations, and cognitive deficits in terms of problems with short-term memory and concentration. (R. 417.) Mental Status Exam showed the following: overall cooperative; adequate social skills and overall presentation; appropriate appearance; fluent, clear, and adequate speech; coherent and goal-directed thought process with no evidence of hallucinations, delusions, or paranoia in the evaluation setting; depressed and anxious affect; dysthymic mood; clear sensorium; orientation to person, place, and time; intact attention and concentration (able to perform simple counting, perform simple calculations, and serial 3s counting backward from 20); impaired recent and remote memory skills (able to repeat 3 out of 3 objects immediately, but only 2 out of 3 objects after delay, she was able to repeat 5 digits forward and only 3 digits backwards); cognitive functioning within average range of intellectual ability and appropriate fund of information; and good insight and judgment. (R. 417-18.) "Mode of Living" findings include the notations that Plaintiff was limited in her ability to do cleaning and laundry because of her physical restrictions, and she goes shopping with someone because she can't lift. (R. 419.) Dr. Primavera diagnosed ADHD by history, bipolar disorder (unspecified), and PTSD by history, and he recommended that Plaintiff continue her outpatient psychological and psychiatric

care.  (*Id.*)

**B.   *Opinion Evidence***

**1.   <u>Physical Impairments</u>**

On June 14, 2013, Juan B. Mari-Mayans, M.D., a State agency
consulting physician, completed a Physical Residual Functional
Capacity Assessment.  (R. 64-65.)  He opined that Plaintiff would
be able to perform a range of light work: she could lift twenty
pounds occasionally and ten pounds frequently; she could stand
and/or walk for about six hours in an eight-hour day, and she could
sit for the same amount of time; and her ability to push and/or
pull was unlimited other than as shown for lift and/or carry.  (R.
64.)

**2.   <u>Mental Impairments</u>**

An Assessment of Mental Ability to Do Work-Related Activities
was completed on March 9, 2013, by Gina Talarico of Berks
Psychiatry.  (R. 262-64.)  The provider assessed that Plaintiff had
moderate limitations in her abilities to relate to peers, use
judgment, interact with authority figures, function independently,
and maintain attention/concentration; and she had marked
limitations in her abilities to deal with the public and deal with
stress.  (R. 262.)  It was noted that the limitations assessed
could vary depending on Plaintiff's level of anxiety.  (*Id.*)
Plaintiff was also assessed to have moderate limitations in her
ability to follow verbal or written instructions, an assessment

based on Plaintiff's "severe anxiety that makes client get up and leave without warning" and the inability to control the behaviors. (R. 263.)  Regarding making personal and social adjustments, "depending on level of anxiety," Plaintiff was found to have moderate limitations in her abilities to behave in an emotionally stable manner and to relate predictably in social situations, and a marked limitation in her ability to demonstrate reliability.  (R. 263.)  It was also noted that Plaintiff was unable to be around people at times, to leave the house at times, and to control her overwhelming anxiety even on medications.  (R. 264.)

On June 17, 2013, Richard W. Williams, Ph.D., a State agency consulting doctor, completed a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity Assessment.  (R. 62-63, 65-67.)  He opined that Plaintiff would have mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and she had no repeated episodes of decompensation, each of extended duration.  (R. 63.)  In his summary explanation, Dr. Williams noted "[a]lthough this claimant does have some emotional issue with which she deals, the medical data in file does not establish a severity level of mental impairment that would prohibit employment."  (R. 67.)

On October 30, 2014, Dr. Primavera completed a Medical Source Statement to Do Work-Related Activities (Mental).  (R. 421-23.)  He

13

opined that Plaintiff had moderate limitations in all abilities related to understanding, remembering and carrying out instructions. (R. 421.) He did not identify factors supporting his assessments. (*Id.*) Dr. Primavera found that Plaintiff had marked limitations in all four areas related to her ability to interact appropriately with supervisors, coworkers, and the public, as well as respond to changes in the routine work setting. (R. 422.) He identified anxiety and agoraphobia as factors supporting the assessments. (*Id.*)

## C. *Hearing Testimony*

At the September 10, 2014, hearing, Plaintiff testified that she does not leave her house every day, she does not like to go up and down steps at all, she has trouble standing, walking, or sitting: she can stand for about twenty minutes before she starts cramping up; and she can walk a city block before she has to stand still and then she might be able to go another block or two. (R. 44-45.) When asked about her physical pain, Plaintiff said it was in her joints, she had pain that ran from her knees to her ankles and from her hip to her knee, and in the morning her feet hurt and she had burning pain in her heels. (R. 49.) Plaintiff added that medication helped but she continued to have pain all day. She also identified pain related to her "left shoulder separated things like that" and it felt like her "bones hurt." (R. 49-50.)

Plaintiff said her mental health medications, which are

14

prescribed by her family doctor, make "a huge difference." (R. 45-46.) She identified weight gain and physical inertia as medication side effects. (R. 46.) Plaintiff also said her therapist helped her with different ways of thinking and exercises to manage her depression and anxiety. (R. 46-47.)

ALJ Hardiman first asked Vocational Expert Karen Cane ("VE") to consider an individual of the same age, education, and work experience as Plaintiff who could work at all exertional levels with the following nonexertional limitations: "[t]he individual would be limited to simple, routine tasks. Low stress as defined as only occasional decision making required and only occasional changes in the work setting. Such an individual should have not interaction with the public or could have occasional interaction with corworkers and supervisors." (R. 52-53.) The VE testified that such an individual could perform several jobs in the national economy and she gave examples of jobs in each exertional category. (R. 53.) By way of example, the VE stated that sedentary unskilled jobs would be video monitor surveillance type positions; light duty would be laundry folder positions; and under medium duty would be janitorial type work. (R. 53.) When the ALJ reduced the hypothetical individual to medium exertional work with all previously identified non-exertional limitations the same, the VE identified the positions of janitorial work, dishwasher, and laundry worker. (R. 53-54.) When the ALJ reduced the hypothetical

individual to light exertional work with all previously identified non-exertional limitations the same, the VE identified positions of mail clerk, laundry folder, and order filler. (R. 54.)

## D.   *ALJ Decision*

In her January 23, 2015, Decision, ALJ Hardiman made the following Findings of Fact and Conclusions of Law:

1. The claimant has not engaged in substantial gainful activity since May 8, 2013, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairment: mood disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations. She is limited to simple, routine tasks, low stress, defined as only occasional decision making and only occasional changes in the work setting. She should have no interaction with the public and only occasional interaction with co-workers and supervisors.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on December 26, 1965 and was 47 years old, which is defined as a younger individual age 18-

49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 8, 2013, the date the application was filed (20 CFR 416.920(g)).

(R. 16-26.)  Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## **II. Disability Determination Process**

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

17

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant

---

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy.  (R. 25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing

19

> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.*

*Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential)

(citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."); *see also Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (a remand is not required where it would not affect the outcome of the case.). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff asserts that the Acting Commissioner's determination should be reversed or remanded for the following reasons: 1) the ALJ's finding that Plaintiff has no severe physical impairments is not supported by substantial evidence and is harmful error; 2) the ALJ's RFC assessment imposing no exertional limitaions is not supported by substantial evidence; and 3) the ALJ committed a reversible error of law by failing to accord greater weight to the opinion of Joseph Primavera, Ph.D. (Doc. 11 at 3.)

### A. *Step Two*

Plaintiff first asserts the ALJ erred in finding that she did not have any severe physical impairments because her lower back pain, reduced range-of-motion of her lower back, osteoarthritis of her knees, and obesity constitute severe impairments. (Doc. 11 at 4, 6.) Defendant responds that substantial evidence supports the ALJ's step two finding. The Court concludes Plaintiff has not

shown that this claimed error is cause for reversal or remand.

At step two, the ALJ must determine whether the claimant has a medically severe impairment that meets the duration requirements in 20 C.F.R. § 416.909, or combination of impairments that is severe and meets the duration requirements. 20 C.F.R. § 416.921(a)(4)(ii). At step two, "an impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28).

> Symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect an individual's ability to do basic work activities unless the individual first establishes by objective medical evidence (i.e., signs and laboratory findings) that he or she has a medically determinable physical or mental impairment(s) and that the impairment(s) could reasonably be expected to produce the alleged symptoms.

*Id.* at *2. "To qualify as a severe impairment, '[t]he physical or mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantial gainful work.'" *Clinton v. Comm'r of Soc. Sec.*, 66 F. App'x 311, 313 (3d Cir. 2003) (not precedential) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 147). *Bowen* confirmed that the burden of showing a medically determinable impairment is

properly placed on the claimant.  482 U.S. at 146.

Here Plaintiff has not satisfied her burden of showing that she had a severe physical impairment.  Back pain and reduced range-of-motion are not impairments, they are symptoms.  SSR 96-3p, 1996 WL 374181, at *2.  Plaintiff has not pointed to any evidence showing that her obesity is "sufficient to justify its consideration as the cause of failure to obtain any substantial gainful work."  *Bowen*, 482 U.S. at 147.  Mere citation to records establishing obesity (Doc. 11 at 4; Doc. 13 at 1) cannot establish severity for purposes of step two.  *Id.*  Finally, in her supporting brief, Plaintiff links no objective medical evidence to the claimed severe impairment of "osteoarthritis of her knees."  (Doc. 11 at 6.)  In her reply brief, Plaintiff states that "x-ray evidence of mild to moderate narrowing of the medial compartments of her knees constitutes objective medical evidence."  (Doc. 13 at 2 (citing 20 C.F.R. § 416.928(c)).)  Without more, a single piece of objective evidence which *may* be linked to osteoarthritis cannot be deemed sufficient to satisfy the established standard, especially when osteoarthritis was not consistently assessed by treating providers and was not assessed at all after September 2014.  (*See* R. 361, 364, 367, 370, 373, 376, 379, 382.)  ALJ Hardiman reviewed diagnostic studies of the knees and hips, stating that the knee x-rays showed "only mild medial compartment joint space narrowing bilaterally and [were] otherwise negative for abnormality."  (R.

18.)  She concluded the knee and hip studies did not support the finding of any significant inflammatory or osteoarthritic condition.  (*Id.*)  Though Plaintiff notes that May 2013 knee x-rays "showed symmetrical mild to moderate narrowing of the medial compartments, with minimal patellar osteophytosis," the recorded impression was "[mild symmetric medial compartmental joint space narrowing in both knees.  No evidence of acute osseous abnormality" (R. 304).  Thus, an inference that the ALJ erred in assessing the knee studies is not supported by the record.

In her reply brief, Plaintiff notes in the discussion of her claimed step two error that State agency reviewing physician Dr. Mari-Mayans found severe impairments of Spine Disorders and Dysfunction-Major Joints and the ALJ rejected these findings because they "lacked support 'from the evidence of record, including objective findings.'" (Doc. 13 at 2 (citing R. 24).) Plaintiff then states that "x-ray evidence of mild to moderate narrowing of the medial compartments of her knees constitutes objective medical evidence."  (*Id.* (citing 20 C.F.R. § 416.928(c)).)  Pointing only to knee x-rays with the recorded impression of "[mild symmetric medial compartmental joint space narrowing in both knees [and] [n]o evidence of acute osseous abnormality" (R. 304) does absolutely nothing to support an Impairment Diagnosis of "Spine Disorders" (R. 62) and, as a single piece of evidence, cannot be deemed sufficient to support a

diagnosis of "Dysfuntion - Major Joints" (*id.*) when no treating or examining physician made such a diagnosis.[3] Because Plaintiff has not pointed to evidence supporting that the medical problems identified by herself or Dr. Mari-Mayans constitute severe impairments, she has not shown that the ALJ erred at step two.[4]

---

[3] To the extent Dr. Mari-Mayans' June 14, 2013, diagnosis of "Dysfunction - Major Joints" (R. 62) may correlate with Dr. Scalia's May 2014 single assessment of "Joint Disorder Unspec Site Unspec" (R. 364), the timing is such that Dr. Mari-Mayans could not have relied on the later assessment.

[4] Even assuming *arguendo* that the claimed step two error had merit, the error must be shown to be harmful. If the sequential evaluation process continues beyond step two, a finding of "nonsevere" regarding a specific impairment at step two may be deemed harmless if the established functional limitations associated with the impairment are accounted for in the RFC. *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). In other words, because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) (not precedential) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity.*"); Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

"An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (quoting *Rencheski v. Williams*, 622 F.3d 315, 341 (3d Cir. 2010)). The "burden of showing that an error is harmful normally falls upon the party

## B.    Residual Functional Capacity Exertional Level

Plaintiff next claims the ALJ erred in her assessment that she was capable of performing a full range of work at all exertional levels. (Doc. 11 at 6.) In support of this assertion, Plaintiff avers that the ALJ improperly rejected Dr. Mari-Mayans' assessment that Plaintiff was capable of performing light work. (Doc. 12 at 8.) The Court concludes Plaintiff has not shown that this claimed error is cause for reversal or remand.

In her *very* brief discussion of this issue, Plaintiff notes the regulatory provision explaining that "State agency medical consultants 'are highly qualified physicians . . . who are experts in Social Security disability evaluation.'" (Doc. 11 at 6 (quoting 20 C.F.R. § 416. 927(e)(2)(i)).) She then notes that the ALJ rejected Dr. Mari-Mayans' opinion, "finding it 'without support from the evidence of record, including objective findings'" (*id.*

---

attacking the agency's determination" *Shineski v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted) (noting exceptions and qualifications not applicable here).

Here, Plaintiff does not discuss what physical limitations are related to the impairments she alleges to be severe or explain how she would be precluded from engaging in substantial gainful activity. (*See* Doc. 11 at 4-6.) In her reply brief, Plaintiff points to Dr. Mari-Mayans' finding that she had the RFC for light work, but she again fails to point to specific limitations or argue that she could not engage in substantial gainful activity. (Doc. 13 at 2.) Thus, Plaintiff has not shown how the alleged error would be harmful—because the evidence relied upon supports an RFC for light work, Plaintiff would not receive benefits if the ALJ had found a severe physical impairment consistent with Dr. Mari-Mayans' opinion and adopted his RFC for light work. *See infra* n.6.

(citing R. 24)), and "submits that the medical evidence discussed earlier supports Dr. Mari-Mayan's [sic] RFC finding" (*id.* at 7). Plaintiff also notes that the ALJ who ruled on an earlier application for SSI benefits "found severe impairments, including fibromyalgia with knee pain, and limited Plaintiff to sedentary work." (*Id.* (citing R. 76, 79).)

Plaintiff does not satisfy her burden of showing error on the basis alleged primarily because she does not show how "the evidence discussed earlier" supports Dr. Mari-Mayans' opinion. (Doc. 11 at 7.) With her conclusory assertion, Plaintiff makes no attempt to correlate the evidence she cited earlier in her brief with Dr. Mari-Mayans' conclusions regarding specific limitations nor does she provide any further critique of the ALJ's opinion assessment. (*See* Doc. 11 at 6-7.) Our review of the record shows that "the evidence discussed earlier" includes documentation of "ongoing complaints of lower back and muscle pain" (Doc. 11 at 4) which is subjective rather than objective evidence. Evidence "discussed earlier" in Plaintiff's brief also includes Dr. Scalia's notations of decreased range-of-motion of the lower back (*id.* at 4-5), findings which are consistently documented but are not suggestive of degree of difficulty or functional limitations, particularly when, in October 2013, Dr. Harrington assessed "[m]yalgia and myositis" unspecified and "[o]steoarthritis, unspecified whether generalized or localized, lower leg" and noted the pain medication

controlled symptoms and osteoarthritis only "occasionally" gave her problems (R. 340, 341). The evidence referenced by Plaintiff includes "a diagnosis of fibromyalgia or myalgia and myositis." (Doc. 11 at 5.) However, the fibromyalgia diagnosis is not longitudinally objectively supported (*see*, *e.g.*, R. 341, 362), and Plaintiff does not assert it to be a severe impairment now (Doc. 11 at 6); myalgia (muscle pain or ache) and myositis (muscle inflammation) are symptom descriptions and not impairments themselves[5] which reportedly were controlled with medication (R. 341). Finally, a review of evidence cited regarding obesity (Doc. 11 at 5) indicates that the records merely note the weight status with no related limitations identified in any record.

Furthermore, Plaintiff's reference to a different ALJ's decision on an earlier SSI application (Doc. 11 at 7) does not support her claimed error. An ALJ is not bound by an earlier decision where a different time period and different evidence are considered. *Carter v. Barnhart*, 133 F. App'x 33, 35 (3d Cir. 2005) (not precedential); *see also Clark v. Barnhart*, 206 F. App'x 211, 214-15 (3d Cir. 2006) (not precedential). *Carter* explained that

> [t]he affirmative defense of *res judicata* did
> not bind [the ALJ in the second decision]
> because the record contained new evidence
> that was unavailable to [the first ALJ], and
> because the relief sought was limited to a
> determination that he was disabled from July
> 1999, instead of May 1995 as alleged in the

---

[5] http://www.nmihi.com/m/myalgia.htm.

earlier application.

133 F. App'x at 35.

Here Plaintiff merely notes the findings in the earlier Decision without supportive authority or recognition of the distinctions between the time period and evidence considered. (Doc. 11 at 7.) Therefore, this claimed basis of support is without merit.

For the reasons discussed above, Plaintiff has not shown that the ALJ's RFC imposing no exertional limitations is not supported by substantial evidence. Therefore, this claimed error is not cause for reversal or remand.[6]

---

[6] This determination is bolstered by the fact that Plaintiff does not address Defendant's response on this issue in her reply brief and only mentions Dr. Mari-Mayans' opinion in the context of the claimed step two error (Doc. 13 at 2.) More importantly, Plaintiff has not discussed harm associated with the alleged error. As with her claimed step two error, she does not argue that a finding of disability would result if the ALJ had given greater weight to Dr. Mari-Mayans' opinion. In this context, Plaintiff does not argue she is not capable of light work or that additional physical nonexertional limitations were warranted. She merely asserts it was error to find she could perform a full range of work at all exertional levels because Dr. Mari-Mayans opined that she had the RFC for light work. (Doc. 11 at 6.) (Dr. Mari-Mayans did not find that Plaintiff had any nonexertional limitations. (R. 64-65.))

As noted previously, "[a]n error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown*, 649 F.3d at 195, and the "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination" *Shineski*, 556 U.S. at 409.

Because the VE testified that a hypothetical individual of Plaintiff's age, education, and experience with nonexertional

## C.    Consulting Examiner's Opinion

Plaintiff asserts the ALJ committed a reversible and harmful error by failing to accord greater weight to the opinion of Joseph Primavera, Ph.D.  (Doc. 11 at 7.)  Defendant responds that substantial evidence supports the ALJ's analysis of the opinion.  (Doc. 12 at 12.)  The Court concludes Plaintiff has not shown the claimed error is cause for reversal or remand.

The regulations provide that more weight is generally given to an examining source than to a non-examining source.  20 C.F.R. § 416.927(c)(1).  Section 416.927(c)(3) provides the following:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

*Id.*

As an examining source, Dr. Primavera's opinion would generally have been given greater weight than the opinion of Dr.

---

limitations identfied by the ALJ could perform jobs that were available in the national economy at the light exertional level (R. 54), a finding of not disabled would result even if the ALJ had adpoted Dr. Mari-Mayans' assessment.

Williams, the State agency doctor whose opinion the ALJ afforded
great weight (R. 24). However, the weight afforded the source
depends on the presentation of relevant evidence to support an
opinion, particularly medical signs and laboratory findings, and
the explanation the source provides for an opinion. 20 C.F.R. §
416.927(c)(3). Here, the ALJ reviewed the limitations found by Dr.
Primavera and concluded

> there is no explanation in terms of signs or
> laboratory findings to support any of the
> marked limitations and the doctor's objective
> findings are devoid of actual objective
> deficits correlated or attributable to those
> areas of function. Further, the longitudinal
> record fails to support that the claimant has
> any significant objective deficits to mental
> functioning, including those areas the
> consultative examiner noted were marked. The
> consultative examiner saw the claimant once
> and is not a treating source. He relied
> exclusively upon the claimant's self-
> reporting and not upon any longitudinal
> treating relationship. As such, only some
> weight can be afforded the moderate
> limitations and little weight can be afforded
> the marked limitations, as the marked
> limitations are clearly not well supported on
> the face of the opinion, the doctor's own
> examination findings, or the record as a
> whole.

(R. 24.)

Plaintiff first argues that the ALJ's analysis fails to take
into account a March 9, 2013, Assessment of Mental Ability to Do
Work-Related Activities which appears to have been completed by
Plaintiff's therapist. (Doc. 11 at 9 (citing R. 261-64).)
Plaintiff maintains that the opinion, which found marked

limitations at that time in abilities to deal with the public and deal with stress and ability to demonstrate reliability (R. 262-63), "tends to bolster the restrictions imposed by Dr. Primavera." (Doc. 11 at 9.) Plaintiff concludes that the ALJ's failure to discuss this evidence was error because it is probative evidence which cannot be rejected without explanation. (*Id.* (citing *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986); *Cotter*, 642 F.2d at 705; *Dobrowolsky*, 606 F.2d at 407).)

Regarding ALJ Hardiman's failure to discuss the March 2013 Berks Psychiatry opinion, Defendant responds that the ALJ did not err in failing to discuss the evidence because it predated the relevant period and, therefore, it is not pertinent to the current disability determination. (Doc. 12 at 14.) Defendant further points out that the only Berks' progress report from the relevant time period, dated May 18, 2013, "reflects that Plaintiff had some mood swings, and she was 'doing ok other than that." (*Id.* (citing R. 286).) In her reply brief, Plaintiff disputes Defendant's relevance point, noting that the Assessment was completed two months before Plaintiff's protective filing date and "[t]here is no indication in the record that Plaintiff's mental functioning drastically improved between March 9 and May 8, 2013." (Doc. 13 at 3.) With this argument, Plaintiff does not acknowledge the May 18,

2013, Berks' progress note from the same provider who completed the March Assessment in which she recorded that Plaintiff reported she was having some mood swings but they were not as bad as they had been and she was "doing ok other than that," Plaintiff specifically said she was not having any problems with sleep or appetite, and evaluation showed that Plaintiff was oriented to time, place, and person, her mood was good, and her interactions were good. (R. 286.) The May report contrasts with notes earlier in the year when Plaintiff reported she was not doing well with increased symptoms of depression including difficulty sleeping, panic attacks, and mood swings. (*See*, *e.g.*, R. 236.) Thus, Plaintiff's statement that the record does not show that Plaintiff's condition improved is not consistent with record evidence and, even assuming *arguendo* the March report had some relevance, Plaintiff has not shown harmful error on the basis that ALJ Hardiman did not consider evidence which predated the relevant time period. *See supra* n.6.

Finally, Plaintiff's assertion that Dr. Primavera's assessment is consistent with findings made by Service Access & Management, Inc., ("SAM") (Doc. 11 at 10-11) does not point to error in the weight ALJ Hardiman afforded Dr. Primavera's opinion. As noted in the Background section of this Memorandum, a January 15, 2014, Interpretive Summary from SAM states that Plaintiff was referred for case management services "to provide support and to aid her with linking to community resources and maintaining mental health

34

counseling services." (R. 412.) Noting a history of depression/anxiety issues and poor coping strategies, the Summary included the notation that Plaintiff needed to remain engaged in mental health counseling services to aid her with developing healthy feelings management skills. (*Id.*) Plaintiff does not explain the suggested support, and the Court concludes that nothing in this summary supports the marked limitations assessed by Dr. Primavera.

Similarly, the January 27, 2014, Psychiatric Evaluation from SAM does not indicate a basis for finding marked limitations. It contains a good deal of background information that is largely illegible (R. 347-48), but the check-the-box Mental Status Exam recorded mostly normal findings including appropriate affect, euthymic mood, coherent thought process; normal attention/concentration, intact memory, and normal appetite, energy, sleep patterns, and libido (R. 353). Plaintiff does not discuss this Mental Status Exam but references the provider's notation that Plaintiff has "a very drastic life story" and lists Plaintiff's diagnoses. (Doc. 11 at 10-11.) This evidence viewed contextually clearly shows that Plaintiff has not provided a basis for the suggested support. First, the characterization of Plaintiff's life story does not support marked limitations. Second, in listing the diagnoses, Plaintiff did not note the provider's assessed GAF of 60 which is at the high end of the

category (GAF of 51-60) representing *moderate* symptoms or any *moderate* difficulty in social, occupational, or school functioning.[7] *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text rev.); *Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 533 n.3 (3d Cir. 2011) (not precedential). Third, Plaintiff has not attempted to show that the SAM Mental Status Exam findings support the marked limitations found by Dr. Primavera and the Court does not find such support.

Because Plaintiff has not shown that ALJ Hardiman's analysis of Dr. Primavera's opinion constitutes harmful error, she has not shown that this matter should be reversed or remanded for further consideration.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly denied. An appropriate Order is filed simultaneously with this Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge


DATED: May 3, 2017

_____

[7] Pursuant to Social Security Administration rules, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009) (citing 66 Fed. Reg. 50746, 50764-65 (2000)). While the significance and use of GAF scores has been debated since the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded from considering GAF scores as evidence. *See*, *e.g.*, *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741, at *9 n.2 (M.D. Pa. Apr. 10, 2015).